William F. Dougherty
Burke & Parsons
100 Park Avenue
New York NY 10017-5533
(212) 354-3800



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| LAVENDER INTERNATIONAL S.A., | |
| Petitioner, | |
| v. | PETITION TO RECOGNIZE AND ENFORCE FOREIGN ARBITRATION AWARD |
| INDUSTRIAL CARRIERS INC., | |
| Respondent. | ECF CASE |

'09 CIV 7907

Petitioner Lavender International S.A. (the "Petitioner"), by its attorneys Burke & Parsons, as and for its Petition against respondent Industrial Carriers Inc. (the "Respondent"), alleges upon information and belief as follows:

**JURISDICTION AND PARTIES**

1.      This matter arises under the Court's federal question jurisdiction within the meaning of 28 U.S.C. § 1331 and the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201, *et seq*.) and the Federal Arbitration Act (9 U.S.C. § 1, *et seq*.).  This is also an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1333.

2.      At all times relevant hereto, the Petitioner was and still is a foreign corporation duly organized and operating under and by virtue of the laws of the Republic of Liberia with an office and place of business at 80 Broad Street, Monrovia, Liberia.

3.      At all times relevant hereto, the Respondent was and still is a foreign corporation duly organized and existing under and by virtue of the laws of the Marshall Islands with an address at c/o The Trust Company of the Marshall Islands Inc., Trust Company Complex, Ajeltake Road, Ajeltake Island, Majuro MH 96960, Marshall Islands.

## TIME CHARTER

4.      Pursuant to a time charter party contract, dated May 27, 2008 (the "Charter"), the Petitioner, as owner, chartered the M/V DESPINA (the "Vessel') to the Respondent, as charterer, for a minimum period of four months to about six months, but not beyond December 5, 2008.  A certified true copy of the Charter has been annexed as Exhibit 1 to the Declaration of Matt Illingworth.  A copy of the Charter is also annexed hereto as Exhibit 1 to this Complaint.

5.      The Charter provided that the Respondent would pay charter hire at a rate of $82,000 per day, pro rata, for the duration of the term of the Charter.  The Respondent was also obligated to provide and pay for all marine fuels, taxes and agency costs.

6.      The Charter further provided that any and all disputes arising thereunder shall be resolved through arbitration before three commercial shipping persons in London, under English law.  The decision of the arbitrators, or that of any two of them, was to be final.

## THE PETITIONER'S CLAIMS

7.      The Vessel was delivered to the Respondent on May 27, 2008 and redelivered to the Petitioner on October 11, 2008.

8.      In its final hire statement dated October 13, 2008, the Petitioner presented the Respondent with its demand for payment, in the total amount of $2,107,824.64, of outstanding hire due through the date of redelivery and reimbursement for the cost of marine fuels

provided to the Vessel during the term of the Charter, three payments of the U.S.

Transportation Tax, various agency expenses, cables, victualling and entertainment charges and

hold cleaning costs.

9.      Despite due demand and its clean contractual obligations under the Charter, the

Respondent failed or refused to remit any part of the total amount of $2,107,824.64.

10.     The Petitioner has satisfied and performed all of its obligations under the terms

and provisions of the charter.

## LONDON ARBITRATION PROCEEDINGS

11.     On November 26, 2008, the Petitioner commenced arbitration proceedings in

London, in accordance with the arbitration agreement contained in the Charter, and appointed

Mr. Edward Mocatta as its arbitrator.  In this proceeding, the Petitioner sought recovery of its

claim of $2,107,824.64, together with interest and costs

12.     Although duly advised by the Petitioner of Mr. Mocatta's appointment and the

requirement that it appoint its own arbitrator within 14 days, the Respondent failed or refused

to appoint its own arbitrator.  Consequently, on December 22, 2008, the Petitioner invited Mr.

Mocatta to act as a sole arbitrator in this matter, pursuant to Section 17 of the English

Arbitration Act of 1996, which invitation Mr. Mocatta accepted.

13.     On February 5, 2009, the Petitioner submitted, and duly served upon the

Respondent, its Claim Submission, requesting service of the Respondent's Points of Defense by

March 5, 2009.

14.     Following the Respondent's failure or refusal to serve its Points of Defense by

March 5, 2009, Mr. Mocatta requested that the Respondent respond to the Petitioner's Claim

Submission within 4 working days.  When the Respondent again failed to respond, Mr. Mocatta issued a preemptory order, on November 13, 2009, directing service of the Respondent's Points of Defense by March 20, 2009.  After the Respondent failed or refused to serve its Points of Defense by March 20, 2009, Mr. Mocatta advised that he would draw up his award on the basis of documents then before him but that he would consider any comments offered by the Respondent prior to the actual issuance of the award.

15.     On March 27, 2009, Mr. Mocatta issued his arbitration award directing the Respondent to pay the Petitioner a total principal sum of $2,040,409.32, plus interest at a rate of 3.5% per annum, compounded quarterly, from November 1, 2008 to the date of payment of the award.  Mr. Mocatta further ordered that the Respondent reimburse the Petitioner's legal costs and arbitration costs of £ 2000, together with interest thereon at a rate of 4% per annum compounded quarterly from the date of payment to the date of reimbursement (the "Final Arbitration Award").  A certified true copy of the Final Arbitration Award has been annexed as Exhibit 2 to the Declaration of Matt Illingworth.  A copy of the Final Arbitration Award has also been annexed hereto as Exhibit 2 to this Complaint.

16.     As of the date this Petition was filed, the total amount of the Respondent's liability to the Petitioner with respect to the still outstanding Final Arbitration Award may be summarized as follows:

| | | |
|---|---|---:|
| a. | Principal amount of Final Arbitration Award | $2,040,409.32 |
| b. | Interest at 3.5% per annum, compounded quarterly (from November 1, 2008) | 63,173.99 |
| c. | Arbitration costs of £2,000 (at £1 = $1.65931) | 3,287.62 |
| d. | Interest on costs at 4% per annum, compounded quarterly (from March 31, 2009) | 60.52 |
| | TOTAL | $2,106,931.45 |

17.     As of the date this Petition was filed, the Respondent has failed or refused to pay

any portion of the outstanding Final Arbitration Award to the Petitioner.

## APPLICATION FOR CONFIRMATION
## OF THE FINAL ARBITRATION AWARD

The Petitioner seeks an order from this Court recognizing and confirming the Final

Arbitration Award as a judgment of this Court pursuant to the United Nations Convention on

the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330

U.N.T.S. 38 and the Federal Arbitration Act, 9 U.S.C. §§ 201-208

The Petitioner respectfully requests that this Court's judgment in this matter include a

provision permitting the Petitioner to submit an accounting of its reasonable attorneys' fees

and costs for the Court's review and awarding the Petitioner such costs and attorneys' fees

incurred as a result of being forced to submit this application.

WHEREFORE, Petitioner prays:

a.     That, pursuant to the United Nations Convention on the Recognition and

Enforcement of Foreign Arbitral Awards, the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*,

and the doctrine of comity, this Court recognize, confirm and enforce the Final

Arbitration Award, in the amount of $2,106,931.45 plus the costs of submitting this

Petition, which was rendered and issued on March 27, 2009, as a Judgment of this

Court.

       b.      That this Court award the Petitioner the attorneys' fees and costs

incurred in prosecuting this Petition; and

       c.      For such other and further or different relief as this Court may deem just

and proper.

Dated:    New York NY
            September 15, 2009

                                     BURKE & PARSONS
                                     Attorneys for Petitioner
                                     LAVENDER INTERNATIONAL S.A.

                                     William F. Dougherty
                                     100 Park Avenue
                                     New York NY  10017-5533
                                     (212) 354-3800
                                     dougherty@burkeparsons.com

9155_0001_S01.DOCX

01-SEP-2008 10:46 From:FAFALIOS LTD        0044207 6960701          To:020 77728200          P.10/27
00442076960701

## GREYSTONE SHIPPING LTD
Shipbrokers
1st Floor, Westbury House, 23-25 Bridge Street, Pinner, Middlesex HA5 3HP
Tel: 020 8868 3847 Fax: 020 8868 4128
Email: handy@greystoneshipping.co.uk
panamax@greystoneshipping.co.uk

To be (signed)

**ORIGINAL**

# Time Charter

### GOVERNMENT FORM
*Approved by the New York Produce Exchange*
November 6th, 1913 – Amended October 20th, 1921, August 6th, 1931, October 3rd, 1946

1　**This Charter Party**, made and concluded in ........ *London* ...... 27th ........ day of *May 2008* ........ ~~19~~
2　Between ..... *LAVENDER INTERNATIONAL S.A. OF MONROVIA, LIBERIA* ...........
3　Owners of the good ~~Steamship/Motorship~~ *"DESPINA" -Description as per Clause 45* ~~of~~
4　~~of.~~ ........ ~~tons gross register and~~ ........ ~~tons net register, having engines of~~ ........
5　~~and with full machinery and equipment in a thoroughly efficient state, and classed~~ ........ ~~indicated horse power~~
6　~~at~~ ........ ~~Tultons~~ ........ ~~cubic feet bale capacity, and about~~ ........
7　~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one half percent of ship's deadweight capacity~~ ~~tons of 2240 lbs.~~
8　~~allowing a minimum of fifty (tons) on a draft of~~ ........ ~~feet~~ ........ ~~inches on~~ ........ ~~Summer freeboard, inclusive of permanent bunkers~~
9　~~which are of the capacity of about~~ ........
10　~~conditions about~~ ........ ~~knots on a consumption of about~~ ........ ~~tons of fuel, and capable of steaming, fully laden, under good weather~~
11　~~now trading~~ ........ ~~tons of best Welsh coal - best grade fuel oil - best grade Diesel oil.~~
12

13　**Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
　　and *INDUSTRIAL CARRIERS INC.* ................................. Charterers of the City of *Majuro, Marshall Islands.*
14　about *One period of minimum 4 months to about 6 months maximum period not to exceed 5th December 2008, via safe* ........ ~~for~~
15　*port(s), safe berth(s), safe anchorage(s), always afloat, always within Institute Warranty Limits* within below mentioned trading limits.
16　Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17　the fulfillment of this Charter Party.
18　Vessel to be placed at the disposal of the Charterers, at ... *on dropping outward pilot Piraeus at any time day or night, Sundays and Holidays*
19　*included* ........
20　~~in such dock or at such wharf or place (where she may safely lie, always afloat,) at all times of tide, except as otherwise provided in clause No. 6, in~~
21　~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be~~
22　~~ready to receive cargo with clean-swept holds~~ *on her arrival at load port* ~~and tight, staunch, strong and in every way fitted for the~~ *ordinary cargo*
23　*service,* having water ballast, winches and
24　~~donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same~~
25　~~time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-~~
26　~~dise, including petroleum or its products or in proper containers~~ ~~excluding~~ *with permitted cargoes only as per Clause 61*
27　~~(vessel is not to be employed in the carriage of Live Stock, but~~ ~~excluding~~ ~~are to have the privilege of shipping a small number on deck at their risk,~~
28　~~all necessary fittings and other requirements to be for account of Charterers) in such lawful trades,~~ ~~between safe port and/or ports in British North~~
29　~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~
30　~~Mexico, and/or South America~~ ........
31　~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~ ~~and/or Europe~~
32　~~October 1st and May 15th, Hudson Bay and all unsafe ports, also excluding when out of season White Sea, Black Sea and the Baltic.~~ ~~Lawrence between~~
33　*Worldwide trading via safe port(s), safe berth(s), safe anchorage(s), always afloat, always within Institute Warranty Limits*
34　*excluding : Murmansk, Pacific C.I.S. , Orinoco River, Amazon, Cuba, Israel, Lebanon, Syria, Angola, Cyprus, Jordan, Iraq*
　　*and Libya and war/warlike zones, Kirkenes, Alaska, North Korea, Vietnam, former Yugoslavia, Finland, Sweden, Koper, Bakar,*
　　*Spitsbergen, Nigeria, Magellan, Sudan Bangladesh, Iran, Algeria/Tunisia/Somalia/Sea of Azov/New Zeland*
　　as the Charterers or their Agents shall direct, on the following conditions:
35　1　That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the
36　insurance of the vessel, also for all the oil, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
37　the vessel in a thoroughly efficient state in hull, machinery and equipment for and during the service
38　2　That, whilst on hire, the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *all* Pilotages, Agencies,
39　Commissions, *boutage for Charterers' business.*
40　Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel puts into
41　a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of
42　illness of the crew to be for Owners account. Fumigation ordered because of cargoes carried or ports visited while vessel is employed under this
43　charter to be for Charterers account. *Costs of communication, representation, victualling and entertainment for Charterers' account to*
　　*be a lumpsum of USD 2,000 - per month or pro-rata.* ~~All other fumigations to be for Charterers account after vessel has been on charter for a~~
44　~~continuous period~~
　　~~of six months or more.~~
45　~~Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but~~
46　Owners to allow them the use of any dunnage and shifting boards already aboard vessel. ~~Charterers to have the privilege of using shifting boards~~
47　~~for dunnage, they making good any damage thereto.~~
48　3　~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49　~~board the vessel at the current prices in the respective ports. the vessel to be delivered with not less than~~ ........
50　........ ~~tons and not to be delivered with not less than~~ ........ ~~tons and not more than~~ ........
51
52　4　That the Charterers shall pay for the use and hire of the said Vessel at the rate of *USD 82,000 (Eighty Two Thousand Dollars) daily See Clause 49,*
　　*including over time payable every fifteen (15) days in advance in* United States Currency ~~per ton on vessel's total deadweight carrying capacity,~~
　　*including bunkers and* ........

**EXHIBIT 1**

1

01.-SEP-2008 10:46 From:FAFALIOS LTD          0044207696070 1          To:020 77728200          P.11/27
                                      00442076960701

53  altered or ..................................... summer freeboard per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at
54  and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55  wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot SKAW / Cape Passero range at any time day or*
56  *night, Sundays and Holidays included* unless otherwise mutually agreed. Charterers are to give Owners not less than .............................. days
57  notice of vessels expected date of re-delivery and probable port.

        5.    Payment of said hire to be made in *See Clause 52A* New York in cash in United States Currency, *fifteen (15) days* semi-monthly in advance,
58  and for the last *fifteen (15) days* half-month or
59  part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60  due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61  hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. Time to count from 7 a.m. on the working day
63  following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they
64  to have the privilege of using vessel at once such time used to count as hire.
65        Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.
68        6.    That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place that Charterers or their Agents may
69  direct, provided *such loading and discharging ports are safely accessible and* the vessel can safely lie always afloat at any time of tide, except at
    such places where it is customary for similar size vessels to safely
70  lie aground.
        7.    That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
    accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers
74  paying Owners ................................... per day per passenger for accommodation and meals. However, it is agreed that in case any fines or extra expenses be
    incurred in the consequence of the carriage of passengers Charterers are to bear such risk and expense. *No passengers.*
76        8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency, and Charterers are to load, stow, and trim *and discharge* the cargo at their expense under the supervision of the Captain, who is to sign Bills of Lading
    for
79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts *See Clause 31.*
80        9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82        10.   That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of $1.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally
    Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate for such victualling.
85        11.   That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
86  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
87  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-
88  sumption of fuel.
89        12.   That the Captain shall use diligence in caring for the ventilation of the cargo
91        13.   That the Charterers shall have the option of continuing this charter for a further period of ...........................................................
92  ................................................................ days previous to the expiration of the first named term, or any declared option
93  on giving written notice thereof to the Owners or their Agents .............................. 27th May, 2008 ........................................... and should vessel
94        16.   That if required by Charterers, time not to commence before .... *28th May, 2008 (due said 27th May 2008 afternoon after bunkering deviation if any*
95  not have given written notice of readiness on or before *28th May, 2008 (due said 27th May 2008 afternoon after bunkering deviation if any* but not later than 4 p.m. Charterers or
    *due to vessel sailing prior to lifting of subs to be for Charterers' account)*
    their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness
97        15.   That in the event of the loss of time from deficiency *and/or default* of men or stores, fire, breakdown or damages to hull, machinery or equipment,
98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99  preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost, and if upon the voyage the speed be reduced by
100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra expenses shall be deducted from the hire.
102       16.   That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105       The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.
107       17.   That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London* New York,
108 one to be appointed by each of the parties hereto, and the third by the two so chosen, their decision or that of any two of them, shall be final, and for
109 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial *shipping* men
110       18.   That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel
114       19.   That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crews proportion General Average shall be adjusted, stated and settled, according to Rules 1-16-16, inclusive, 17 to 22, inclusive, and Rule F of
116 York-Antwerp Rules *1994 at London* 1924 at such port or place in the United States as may be selected by the carrier and as to matters not provided for by
    these
117 Rules, according to the laws and usages at the port of *London* New York In such adjustment disbursements in foreign currencies shall be exchanged into
118 United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at

119  ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120  ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121  ~~or his agents may deem sufficient as additional security for the contribution of the goods and/or for any salvage and special charges thereon, shall, if~~
122  ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123  ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124  ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125  ~~United States money.~~
126  ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127  ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible by statute, contract or otherwise, the~~
128  ~~goods, the shipper and the consignees, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129  ~~losses or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130  ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131  ~~ships belonged to strangers.~~
132  ~~Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder~~
133  ~~20.  Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the~~
134  ~~cost of replacing same, to be allowed by Owners.~~
135  ~~21.  That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136  ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137  ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138
139
140  ~~22  Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to three tons, also~~
141  ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
142  ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel~~ *electric light as on board* ~~lanterns~~
143  ~~and oil for~~ night work, and vessel to give use of electric light *for night work* ~~when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~
144  ~~Charterers to have the use of any gear on board the vessel.~~
145  ~~23  Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;~~
146  ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147  ~~deck hands and donkeyman for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148  ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149  ~~insufficient power to operate winches, Owners to pay for stand-by time in respect, if required, and pay any loss of time occasioned~~
150  ~~thereby.~~
151  ~~24  It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152  ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153  ~~etc.", in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154  ~~of which are to be included in all bills of lading issued hereunder~~
155  ~~U.S.A. Clause Paramount~~
156  ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157  ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158  ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159  ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160  ~~Both-to-Blame Collision Clause~~
161  ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162  ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163  ~~hereunder will indemnify the Carrier against all loss or liability to the other non-carrying ship or her owners in so far as such loss~~
164  ~~or liability represents loss of or damage to or any claim whatsoever of the owners of said goods, paid or payable by the other non-~~
165  ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other non-carrying ship or her~~
166  ~~owners as part of their claim against the carrying ship or carrier.~~
167  25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169  port or to get out after having completed loading or discharging
170  26  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171  navigation of the vessel, insurance, crew, and all other matters, same as when trading for their own account.
172  27  A commission of *1,25 2-1/2* per cent is payable by the Vessel and Owners to *GREYSTONE SHIPPING LTD.*
173
174  on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter
175  28  An address commission of *3.75 2-1/2* per cent payable to *Charterers* ............... on the hire earned and paid under this Charter.

*Additional Clauses 29 to 93, both inclusive, as attached are deemed to be incorporated in this Charter Party*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
## M/V "DESPINA" INDUSTRIAL DATED LONDON 27ᵗʰ MAY 2008

Clause 29
Owners to supply valid deratisation or exemption certificates. Should such certificates expire during the period of this Charter and fumigation, deratisation be necessary , cost and arrangements of renewal of such certificates applying only to ship to be for Owners' account .

Clause 30
Constants including lubricating oil, spares and stores together not to exceed 800 tons.

Clause 31
The Charterers shall indemnify the Owners from all consequences arising from the Master signing Bills of Lading or from complying with the orders and directions of the Charterers or from any irregularity in the vessel's papers.

The Owners shall not be responsible for shortage, nor for damage to or claims on cargo caused by bad stowage or otherwise, unless such damage/shortage is caused by the negligence of the Master/Crew.

Clause 32
Stevedores Damage Clause:
The Master is to advise Charterers immediately of any damage done to the vessel for which they may be liable and to notify in writing the responsible party.

Should any damage be so caused, the Master to make best efforts to obtain the written acknowledgement of the responsible party and have a survey made to define and estimate the damage in agreement with the ship's Agents or supercargo, unless the damage should have been repaired in the meantime. Vessel not to be off-hire during survey for such damage .
Charterers are not to be responsible for any stevedore damage done to the vessel unless notified in writing by the Master latest 48 hours after such occurrence except hidden damage, which should be reported as soon as detected . Charterers not to be liable for damage when the Master has acknowledged to the responsible party in writing that the loading/discharging operations have been performed without any damage, or that the repairs have been carried out to his satisfaction, or that listing of damages and due admission of liability have been given by stevedores or that proper compensation has been remitted by stevedores to the Master.

If during the performance of this Charter-Party stevedores employed by the Charterers should cause such damage to vessel which affects her class condition and if such damages should then not be repaired by such stevedores, Charterers will be responsible for the cost and time of such necessary repairs.

Clause 33
All fuel oil used by vessel while off-hire and the cost of replacing same to be for Owners' account.

l

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
## M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

Clause 34
Owners to be responsible for all consequences of smuggling or similar offences by
Master, Officers and crew and any detention of vessel caused thereby to count as off-hire.

Clause 35
Charterers to have the benefit of any return insurance premium receivable by the Owners
from their Underwriters (as and when received by Underwriters) by reason of the vessel
being in port for a minimum period of two months if on full hire for this period, or pro-
rata for the time actually on hire.

Clause 36
Survey Clause
A joint full on-hire/off-hire condition / bunker survey to be held by an independent
surveyor formally agreed by both parties at the port of delivery/redelivery, or if mutually
agreed at the most convenient and proximate time/ place/port to delivery/redelivery
time/place/port.

Time and cost of the surveys to be equally shared between Owners and Charterers.

Clause 37
Basic war risk Insurance and war risk bonus to Master and crew to be for Owners'
account, but any additional war risk insurance premium including coverage for loss of
hire and extra war bonus paid by Owners which result from Charterers' trading vessel to
areas which require such additional insurance cover and bonus shall be paid by
Charterers.
The orders of Owners' War Risk Underwriters are always to be followed.

Clause 38
Both parties to have the option of cancelling this Charter-Party if war breaks out or is
declared between any two or more of the following countries :

U.S.A., Great Britain, Republic of China, Japan, C.I.S., People's Republic of China and
country of vessel's flag.

Clause39
All opening and/or closing of vessel's hatches to be done by vessel's crew free of
expense to Charterers if permitted by port's labour regulations, otherwise shore hands to
be for Charterers' account.

Clause 40
Charterers to make no charge whatsoever to Owners/ship for galley or domestic fuel
consumption.

2

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
## M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

**Clause 41**
Should the vessel put back whilst on voyage by reason of an accident or breakdown, the hire shall be suspended from the time or putting back until she is again in the same or equivalent position and the voyage resumed therefrom.
The time so lost and the cost of any extra fuel consumed in consequence thereof and all extra expenses shall be deducted from the hire.

**Clause 42**
Normal quarantine time and expenses to enter the port to be for Charterers' account, but any time, deduction of the expenses for quarantine due to pestilence, illness etc., of the vessel's Master, Officers and crew to be for Owners' account .

**Clause 43**
Extra insurance due to ship's flag and/or class and/or Ownership or age, if any, for Charterers' account.

**Clause 44**
Should the vessel be on her voyage towards port of redelivery at time of payment of hire is due, said payment should be made for such length of time as Owners or their Agents and Charterers and their Agents may agree upon as the estimated time necessary to complete the voyage, taking into account authorised disbursements for Owners' account before redelivery and when vessel is redelivered any difference shall be refunded by Owners or paid by Charterers as the case may be.

**Clause 45**
Vessel's Description

```
M.V. DESPINA
============

OWNER               LAVENDER INTERNATIONAL S.A. OF MONROVIA,
LIBERIA
EX NAME             PACIFIC BRILLANCE
TYPE                BULK CARRIER
FLAG/PORT OF REG.   GREEK/CHIOS - OFFICIAL NO. 386
CLASS               A.B.S.
NOTATION            +A1(E) BULKCARRIER + AMS + ACCU
TELEX/FAX NOS       1132442 (INM-A) 423946910 (INM-C)/FAX 1132443
(INM-A)
CALL SIGN           S V D K (GMDSS FITTED)
DEADWEIGHT          65,644 METRIC TONNES ON 13.137
GRT/NRT             36,438/22,310
SUEZ GRT/NRT        38,470/34,497
PANAMA  GRT/NRT     38,720/30,642 (PC/UMS) BUNKER FUEL FOR
BALLAST RATE
                    LIMITED TO 3229 METRIC TONS
BUILT               1993 (CHINA) - HULL NO. 2200
ENGINE              B & W 5L70MCE
LOA                 225.0 METRES
```

3

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
## M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

Clause 45
Vessel's Description (cont.)

```
BEAM                32.2 METRES
DEPTH               18.0 METRES
NO. HOLDS/HATCHES   7/7
GRAIN CAPAC.        78,066 CUBIC METRES (2,756,510 CUBIC FEET)
HATCH COVERS        MACGREGOR SIDE ROLLING
HATCH SIZES         NO.1 14.6 X 13.2 M NOS. 2-7 14.6 X 15.0 M

ALL SPEEDS ARE AVERAGE LADEN/BALLAST
SPEED AND           ABT 14.0 ON 32 (180CST) IFO PLUS 1.0 MDO
CONSUMPTION         ABT 13.0 ON 27 (180CST) IFO PLUS 1.0 MDO
PORT CONS.          ABOUT 2.0 MT MDO + 1.0 MT IFO PER 24 HOURS
VESSEL USES MDO WHEN MANOEUVERING, IN NARROW/RESTRICTED WATERS,
DURING BALLASTING/DE-BALLASTING, BALLAST  EXCHANGE AND HOLD
WASHING. MDO MAY BE USED FOR SAFETY OF VESSEL DURING BAD WEATHER
(BEAUFORT SCALE 8 AND ABOVE AND/OR SWELL/WAVES EXCEDING 5 METERS)

ALL BUNKERS SUPPLIED TO THE VESSEL TO CONFORM TO THE
SPECIFICATIONS:
IFO ISO 8217 RME 25 AND MDO ISO 8217 DMB AND MARPOL ANNEX VI
PROCEDURES,
REQUIREMENTS AND RECOMMENDATIONS.

F.O. CAPACITY       ABT 2700 MT
D.O. CAPACITY       ABT  250 MT
F.W. CAPACITY       ABT  500 MT

GRAIN BREAKDOWN BY HOLD IN CUBIC METRES AND (CUBIC FEET):
NO.1  9,407 (332,161)  NO.2 11,817 (417,258)   NO.3 11,796
(416,517)
NO.4 11,922 (420,965)  NO.5 11,682 (412,491)   NO.6 11,708
(413,410)
NO.7  9,734 (343,707)

ALL DETAILS GIVEN ''ABOUT'
```

Clause 46
New Jason Clause, Baltime 1939 War Clause and New Both-to Blame Collision Clause
to be considered incorporated in the Charter-Party.
U.S.A. Clause Paramount to be included in Bills of Lading and to be incorporated or
considered part of this Charter-Party.

Clause 47
Vessel to maintain all necessary certificates on board valid for world-wide trading
throughout the Charter-Party period including a valid certificate of Financial
Responsibility for Oil Pollution in accordance with the requirements of the U.S. Water
Quality Improvement Act 1970 and subsequent amendments thereto. Should any delay to

4

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
## M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

**Clause 47 (cont.)**
the vessel or any extension of the voyage occur from failure to comply with the above, vessel to be considered off-hire for the period of such delay or extension.

**Clause 48**
Vessel is suitable for grab discharge and no cargo to be loaded in places inaccessible for grab discharge. Charterers privilege to use bulldozers in holds, Charterers remaining responsible for any damage arising therefrom.

**Clause 49**
Bunkers expected on delivery about 1,700 metric tons IFO and about 110 metric tons MDO.

Bunkers on redelivery about same quantities as actually on delivery.

Same prices at both ends: U.S.$ 675.00 per metric ton for Intermediate Fuel Oil and U.S.$. 1250.00 per metric ton for Marine Diesel Oil.

Owners confirm that above quantities are as presently on board and that the vessel will not take any further bunkers prior to giving delivery.

Charterers have the right to deduct from last sufficient hire payments bunkers remaining on board on redelivery.

**Clause 50**
Vessel not obliged to force ice. If on account of the ice the Master considers it dangerous to remain at the loading or discharging places for fear of the vessel being frozen in and/or damaged, he has the liberty to sail to a convenient open place and await Charterers' fresh instructions. Unforeseen detention through any of the above causes to be for Charterers' account.

**Clause 51**
Charterers paying U.S.$. 6,000.00(Six Thousand Dollars) in lieu of hold cleaning before redelivery excluding dunnage/lashing removal.

All dunnage/lashing removal to be for Charterers' account.

**Clause 52**
A)  No cargo to be loaded, if first hire and cost of bunkers on delivery are not received in Owners' bank and credited to Owners' account and no cargo to be discharged if hire and all outstanding items are not paid up to estimated time of redelivery as defined by Owners.

In case of any overpayment solely due to Owners' definition of redelivery said overpayment to be refunded by Owners to Charterers latest 10 days after redelivery.

5

### ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
### M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

**Clause 52 (cont.)**
Hire to be paid net of all Bank charges by direct SWIFT(MT 100) to;

Berenberg Bank, Hamburg, Germany
Swift address: B E G O D E H H
to credit: Compania Financiera el Sol SA
A/c no: 5.21561.001
IBAN no: DE69 2012 0000 0521 5610 01
Ref: m/v DESPINA/ICI-T/C 27.5.08
Cover remittance via First Union Bank International, New York
Swift address: P N B P U S 3 N N Y C

B)  Evidence of receipt of funds by Owners bank shall constitute compliance of Charterers' obligation to pay hire in accordance with Clause 5.

C)  Failing payment of full hire due, less any specifically agreed amount, the Owners will have the right to withdraw the vessel without prejudice to any claim the Owners may have against the Charterers under this Charter. Further, so long that the full hire due less any specifically agreed amount remains unpaid, Owners will be entitled to suspend the performance of any and all of their obligations under this Charter-Party, in port or at sea and shall have no responsibility whatsoever for any direct or indirect consequences thereof in respect of which the Charterers hereby indemnify the Owners and hire shall continue to accrue and any extra expenses resulting from such suspension shall be for Charterers' account.

D)  Where there is any failure to make "punctual and regular payment" due to oversight, negligence or error or omission of Charterers or their Agents, employees or otherwise for any reason where there is absence of intention to fail to make payments as set out, Charterers shall be granted one banking days grace to rectify the failure, after which delay, should conditions of paragraph (B) above not be satisfied, provisions of paragraph (C ) above would apply.

E)  Hire is payable when due without the requirement or subject to receipt by Charterers of an invoice from Owners.

F)  If hire is late Charterers waive all their rights to claim under this Charter Party.

G)  Late payment of hire shall constitute a fundamental breach of this Charter Party whereby Owners reserve all their rights as stated above.

**Clause 53**
Should the vessel be boycotted or blacklisted in any port by stevedores or port authorities because of her flag or conditions of crew, all expenses, delays or other consequences to be for Owners' account. However, such expenses shall not be Owners' account if by

6

### ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
### M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

**Clause 53 (cont.)**
reasonable and due diligence Charterers can ascertain at time of business that such problem may arise and accordingly take measures to avoid the business

**Clause 54**
Owners to keep Charterers always closely advised about vessel's position.

**Clause 55**
Owners guarantee vessel is not blacklisted by any Arab country.

**Clause 56**
Vessel has previously traded U.S.A. without encountering any problems in respect of labour Safety/Health Regulations as governing in U.S.A.

**Clause 57**
In the event of a strike of a part of the ship's crew preventing vessel from normal working and sailing, the hire shall be suspended from such time until the resumption of the work.

**Clause 58**
Owners guarantee that on delivery the minimum terms and conditions of employment of crew of the vessel will be covered by a contract acceptable to ITWF or by a Bona Fide Trade Union Agreement acceptable to the ITWF and will remain so during the currency of this Charter.

**Clause 59**
Charterers agree to have their Agents to attend if required by the Owners to all Owners' matters, Owners in such case to refund Agents outlay and pay them agency fee as may be mutually agreed between Owners and Charterers Agents, but in any case not more than the customary agency fee at relevant port.

**Clause 60**
Owners confirm vessel is ISPS compliant.

**Clause 61**
Permitted cargoes
IRON ORE AND/OR IRON ORE PELLETS AND/OR CONCENTRATES IN BULK,
EXCL DRI/DRIP/HBI
COAL EXCL POND COAL,
GRAIN/GRAIN PRODUCTS - DESCRIBED AS PER WORDING OF
ALKYON/PANOCEAN
BAUXITE,
ALUMINA,
PIG IRON (WITH SOFT LANDING CLAUSE),
ROCKPHOS,
MOP,DAP,BULK UREA (ALWAYS EXCL TECHNICAL UREA),
ALL DUNNAGE REMOVAL FOR CHARTS ACCT

7

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
## M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

**Clause 61 (cont.)**
ALL CARGOES TO BE LOADED/STOWED/CARRIED AND DISCHARGED ACCORDING
TO IMO RECOMMENDATIONS AND LOCAL REGULATIONS.
IN CASE OF LOADING PIG IRON FOLLOWING SOFT LOADING CLAUSE SHALL
APPLY:
Charterers undertake that the first layers of PIG IRON loaded
shall be
lowered to the bottom of the hold carefully and shall be of
sufficient
quantities to provide a proper flooring cushion.
No cargo will be dumped/dropped from the height of hatchcoamings
during loading.

**Clause 62**
Charterers to give fifteen (15) days approximate notice of redelivery port and date, then
10/5/3/2/1 days notice of redelivery port and date.

**Clause 63**
Charterers to have the privilege of flying their house flag.

**Clause 64**
The vessel is fitted and has the necessary certificates on board for the passage of the Suez
Canal.

**Clause 65**
For the purpose of computing hire GMT time to apply.

**Clause 66**
Before redelivery Owners may replenish bunkers provided same not interfering with
commercial operations.

**Clause 67**
**Taxes**
All taxes and/or dues on the vessel and/or cargo and freight arising out of cargoes carried
or ports visited under this Charter-Party shall be for Charterers' account.

**U.S. Tax Reform 1986**
Any U.S. Gross Transportation tax enacted by the U.S. Public Law 99.514(also referred
to as the U.S. Tax Reform Act of 1968) including latest changes or amendments, levied
on income attributable to transportation under this Charter-Party which begins and ends
in the U.S.A. and which income under the laws of the U.S.A. is treated as U.S. source
Transportation Gross income, shall be reimbursed by the Charterers.

**Clause 68**
Deleted.

8

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
## M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

Clause 69
Charterers undertake to inform Owners during the period of this Charter-Party as regards
the future itinerary of the vessel and the name and full styles of their Agents at ports of
call whenever so required by the Owners.

Clause 70
All negotiations and fixture to remain fully private and confidential and not to be reported
by any of the parties or channels concerned.

Clause 71
Charterers shall not be permitted to employ the vessel consecutively for more than thirty
days in any trade(s) where steaming at Charter-Party speeds between ports is less than
seven days.

Clause 72
Owners permitted to perform a dry-dock during the currency of this Charter Party in
cases of emergency only.

Clause 73
All bunkers supplied to the vessel under this Charter-Party to conform to the
specifications : 380 CST RMG 380 and MDO DMA ISO 8217:2005 (E) and MARPOL
Annex VI Procedures, Requirements and Recommendations.
It is a condition of supply that two sealed drip samples be taken jointly during the transfer
of fuel to the vessel at the ships manifold. These samples shall be signed by both parties
and shall be used for the purpose of quality analysis of the supplied bunkers. Any refusal
to participate in the sampling or refusal to sign by either party shall constitute acceptance
of the above sample and its implications.

Charterers are to ensure that all bunkers, bunkers suppliers, bunker delivery procedures
(compliant bunker delivery notes and sampling location at ship's manifold) fully comply
with the requirements of Annex VI of MARPOL 73/78 and in particular that all bunkers
delivered to the vessel conform to regulations 14 and 18 of Annex VI.

Clause 74
Hire to be remitted net of all bank charges and Charterers/Brokers to give Owners a
detailed breakdown of each hire payment.

Clause 75
If vessel is in a port or at an anchorage for more than thirty days, Charterers waive their
rights to any performance claims until vessel has been bottom cleaned or dry-docked.

Clause 76
In the event Original Bills of Lading are not available at discharge port, Owners agree to
release the cargo without presentation of Original Bills of Lading, provided Charterers

9

## ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
## M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

Clause 76  (cont.)
have submitted to Owners a Letter of Indemnity as per Owners' P and I  Club wording.
Such Letter of Indemnity to be based on English Jurisdiction and London Arbitration.

Clause 77
Vessel has not traded C.I.S. Pacific ports in the last two years.

Clause 78
Owners warrant to have secured and to carry on board the vessel a U.S. Federal Maritime
Commission Certificate of Financial Responsibility as required under the U.S. Water
Quality improvement Act of 1970. In addition, Owners agree to comply with any and all
official regulations pertaining to water pollution as applicable. Any time lost on account
of vessel's non-compliance with Government and/or State and/or Provincial Regulations
pertaining to water pollution to be off-hire.

Clause 79
BIMCO I.S.M. Clause
From the date of coming into force of the International Safety Management (ISM) Code
in relation to the Vessel and thereafter during the currency of this Charter-Party, the
Owners shall procure that both the Vessel and "the Company"(as defined by the ISM
Code) shall comply with the requirements of the ISM Code. Upon request the Owners
shall provide a copy of the relevant Document of Compliance (DOC) and safety
Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter-Party, loss, damage, expense or delay
caused by failure on the part of the Owners or "the Company" to comply with the ISM
Code shall be for the Owners' account.

Clause 80
No deck cargo.

Clause 81
Charterers have the option to double-bank vessel alongside another vessel / coaster /
barges / lighters at a safe dock / wharf / berth or anchorage for loading / discharging /
transhipment of cargo and / or bunkering. Such operation to be carried out under the
Master's approval in respect of general safety to his vessel and cargo. The Master may
remove his vessel at any time in his sole discretion. Charterers to supply at their expense
sufficient fenders to Master's satisfaction for the operation. Charterers to indemnify
Owners from any damages to the vessel and/or loss of hire resulting from such operation.

Owners are not to be responsible for any cargo claims arising as a result of such loading
/discharging transhipment operations.

10

### ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
### M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

**Clause 82**
Charterers and/or their Agents are authorised to sign Original Bills of Lading on Master's behalf in accordance with Mate's receipts.

**Clause 83**
Cargo claims to be settled as per Interclub Agreement.

**Clause 84**
Arbitration / General Average London, English Law to apply.

**Clause 85**
ISPS / MTSA CLAUSE FOR TIME CHARTER PARTIES 2005
(a) (i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

   (ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificates (or the Interim International Ship Security Certificates) and the full style contact details of the Company Security Officer (CSO).

   (iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/ "Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter-Party.

(b) (i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code / MTSA. Where sub-letting is permitted under the terms of this Charter-Party, the Charterers shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners and the Master, Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter-Party contain the following provision:

   *"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-Charterers are likewise provided to the Owners.*

   (ii) Loss, damages, expense or delay (excluding consequential loss, damages,

1J

ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

Clause 85 (cont.)
ISPS / MTSA CLAUSE FOR TIME CHARTER PARTIES 2005
expense or delay) caused by failure on the part of the Charterers to comply with
with this Clause shall be for the Charterers' account, except as otherwise
provided in this Charter Party.

(c )    Notwithstanding anything else contained in this Charter Party all delay, costs
or expenses whatsoever arising out of or related to security regulations or
measures required by the port facility or any relevant authority in accordance
with the ISPS Code/ MTSA including, but not limited to, security guards, launch
services, vessel escorts, security fees or taxes and inspections, shall be for the
Charterers' account, unless such costs or expenses result solely from the
negligence of the Owners, Master or crew. All measures required by the Owners
to comply with the Ship Security Plan shall be for the Owners' account.

(d)    If either party makes any payment which is for the other party's account
according to this Clause, the other party shall indemnify the paying party.

Clause 86
Intermediate Hold Cleaning
Vessel remain on hire whilst cleaning/preparing cargo holds for intermediate voyages
within this Charter Party and also during holds rejections periods. The Charterers have
the option to request vessel's crew to clean holds between voyages provided sea/weather
conditions, transit time and applicable regulations permit. The crew perform the job to
the best of their ability without any guarantee that the subsequent inspections will be
passed. Owners/Master and/or crew not be blamed and/or held responsible if holds are
not approved at loading port and vessel always to remain on hire, however crew to
continue cleaning for cleanliness approval purposes but always taking into account above
mentioned provisions. Charterers to pay Owners USD 5,000.00 lump sum. Fresh water
and other related cleaning materials needed to be additionally paid by Charterers. If
required by Charterers, Master to co-operate by cleaning holds during discharge, but
Owners not to be responsible for any eventual short-lifting due to retained washing.

Clause 87
California Stowage Clause
No California block stowage under this Charter Party.

Clause 88
Vessel not to engage in any coastal trading (I.E. within the same country) such as
Australia or Indian under this Charter Party.

Clause 89
Special Equipment.
If any trade in which the vessel engages requires any special equipment over and above
what is onboard or what constitutes minimum class requirements all such equipment
(such as ropes, fenders etc.) to be for Charterers account.

12

### ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
### M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

**Clause 90**
No Questionnaire (except rightship one) to be filled out under this Charter Party.

**Clause 91**
<u>Asian Gypsy Moth</u>
Vessel not to trade any ports where there is any Asian Gypsy Moth infestation or any other moth infestation and Charterers to be fully responsible for any consequences resulting from trading to such areas.

**Clause 92**
Vessel on delivery to have all hold clean swept, washed down, dried up ready to receive any permissible cargo under this Charter Party to independent surveyors satisfaction. Failing which vessel to be off-hire till reinspected and accepted, provided all the cargo is ready and waiting on the wharf.

**Clause 93**
<u>AMS Clause</u>
a) Notwithstanding anything else contained in this Charter Party, all costs and changes associated with the procurement of an ICB as defined by the RAEPCI for calling at any U.S. Port and the filling of the AMS, incurred in respect of the particular voyage to the United States, shall be for the Charterers' account.

b)The Charterers shall assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with its obligations under this Clause.

c)If the Vessel is delayed, detained, attached, seized or arrested as a result of the Charterers' failure to comply with its obligations under this Clause, the Charterers shall provide a bond or other appropriate security to ensure the prompt release of the vessel . Notwithstanding any other provision in this Charter Party to the contrary, the vessel shall remain on hire and any delay or time lost shall be entirely for the Charterers' risk and account, unless delay has been caused by the Owners breach of its obligations hereunder.

l3

### ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
### M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

### U.S.A. CLAUSE PARAMOUNT:

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the Carriage of Goods by Sea Act of the United States, approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities of liabilities under said Act.
If any terms of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent, but not further.

### New Both-to-Blame Collision Clause:

If the liability for any collision in which the vessel is involved while performing this Charter Party fails to be determined in accordance with the laws of the United States of America, the following clause shall apply:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represent loss of, or damage to, or any claim whatsoever of the Owners of said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of said goods and set-off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or Carrier.

The foregoing provisions shall also apply where the Owners, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact".

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

### THE NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods, Shippers, Consignees or Owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his Agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or Owners of the goods to the Carrier before delivery.

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same Clause.

14

01-SEP-2008 10:49 From:FAFALIOS LTD          0044207696070l          To:020 77728200          P.27/27
00442076960701

### ADDITIONAL CLAUSES TO THE CHARTER PARTY OF
### M/V "DESPINA" INDUSTRIAL DATED LONDON 27th MAY 2008

## BALTIME 1939 WAR CLAUSE

A) The vessel, unless the consent of the Owners be first obtained not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operations, act of piracy or of hostility or malicious damage against this or any other vessel or its cargo by any person, body or state whatsoever, revolution, civil war, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions, nor carry any goods that may in any way expose her to any risks or seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any Government or Ruler.

B) Should the vessel approach or be brought or ordered within such zone, or be exposed in any way to said risks, 1) the Owners to be entitled from time to time to insure their interests in the vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand, and 2) notwithstanding the terms of Clause 11, hire to be paid for all time lost including any lost owing to loss of or injury to the Master, Officers and crew or to the action of the crew in refusing to proceed to such zone or to be exposed to such risks.

C) Deleted.

D) The vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the Government of the nation under whose flag the vessel sails or any other Government or any person (or body) acting or purporting to act with the authority of such Government or by any committee or person having, under the terms of war risk insurance on the vessel the right to give any such orders or directions.

E) In the event of the nation under whose flag the vessel sails becoming involved in war hostilities, warlike operations, revolution, or civil commotion, both the Owners and the Charterers may cancel the Charter and, unless otherwise agreed, the vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of section A) from reaching or entering it, then at a near open and safe port at the Owners' option, after discharge of any cargo on board.

F) If in compliance with the provisions of this Clause anything is done or is not done, such not to be deemed a deviation.

G) The Baltic Conference War Risks Clause for Voyage Charters 1938, Code Name "Saline", shall be incorporated in all sub-charters and Bills of Lading entered into or issued in respect of the vessel during the currency of the Charter.

**·········· END ··········**

**IN THE MATTER OF THE ARBITRATION ACT 1996**

**AND**

**IN THE MATTER OF AN ARBITRATION**

**BETWEEN:**

**Lavender International SA. of Monrovia**                    **Claimants**
                                                             **(Owners)**

and

**Industrial Carriers Inc. of Majuro Marshall Islands**     **Respondents**
                                                             **(Charterers)**

**Final Award**

**Mv "Despina" T/C 27.5.08**

1.  On 27th May 2008 Lavender International SA (hereinafter referred to as "the
    Owners") let the "Despina" (hereinafter referred to as "the vessel") to Industrial
    Carriers Inc (hereinafter referred to as "the Charterers") on NYPE 1946 form Time
    Charterparty for a period of a minimum 4 to about 6 months maximum not to exceed
    5th December 2008 at rate of hire of US$82,000 per day pro-rata. The vessel was
    delivered to the Charterers on 27th May 2008 and redelivered in Lisbon on 11th
    October 2008. The last payment of hire was due on 5th October 2008 covering the
    period up to the anticipated date of re-delivery. This instalment of hire was not paid.
    Owners seek its recovery together with other items detailed later in this Award
    totalling US$2,107,824.64, together with interest and costs.

2.  Clause 17 of the Charterparty read:
       "17. That should any dispute arise between Owners and the Charterers, the matter in
       dispute shall be referred to three persons in London one to be appointed by each of
       the parties hereto, and the third by the two so chosen, their decision or that of any
       two of them, shall be final, and for the purpose of enforcing any award, this
       agreement may be made a rule of the Court. The Arbitrators shall be commercial
       shipping men."

3.  Additional Clause 84 of the Charterparty read:
       "Clause 84. Arbitration/General Average London English Law to apply"

4.  On 26th November 2008 the Owners, who were represented throughout by London
    solicitors holman fewick willan, appointed me Mr Edward Mocatta of Suite 4, 4th
    Floor Linton House 39-51 Highgate Road London NW5 1RS, to be their Arbitrator.
    On the same day Owners advised the Charterers of my Appointment and at the same
    time gave notice requiring Charterers appoint their own Arbitrator within 14 days.

EXHIBIT 2

2

Charterers did not appoint an Arbitrator; so on 22nd December 2008 Owners invited me to enter the Reference as sole Arbitrator. I did so later that day by e-mail sending copies to ebigler503@comcast.net and operations@greystoneshipping.co.uk. It follows that the seat of this Arbitration is in England.

5.   On 5th February Owners served their Claims Submissions asking that Charterers serve their Points of Defence by 5th March 2009. Copies were sent to the Trust Company of the Marshall Islands Inc by e-mail attention James M Myazoe and to Greystone Shipping Ltd attention Gianmarco Maragoni.

6.   On 5th March 2009 Owners advised me that there had been no response from Charterers and asked that I set a deadline. I asked the Charterers to respond within 4 working days failing which I would make a final order on peremptory terms. Again there was no response from the Charterers; so on 13th March Owners asked me to make a final order on peremptory terms. On 13th March 2009 I made an order on peremptory terms that the Charterers serve Points of Defence by 20th March 2009, failing which I would declare the exchange of pleadings and submissions closed and would then proceed to my Award on the basis of the documents at that time before me. I indicated that the Charterers had declined all invitations and requests to participate in this Arbitration but had failed to respond. I closed this message "This is a last chance, which I hope will be taken". This message was sent to TCMI, Greystone Shipping and E Bigler.

7.   Charterers still failed to respond and on 23rd March Owners asked me to proceed to an Award on the basis of the documents currently before me. I then advised the Charterers that the exchange of pleadings and submissions was closed and that I was proceeding to draw up my Award on the basis of the documents then before me, principally the Claims Submissions. I closed this message by saying that if the Charterers cared to say anything before I actually published my Award I would take such comments into consideration. At the time of publication I have heard nothing from the Charterers. This message was sent to TCMI, Greystone Shipping and Mr E Bigler.

8.   While I am completely satisfied that the Charterers had ample notice of this Reference and have deliberately declined to respond or to participate, I must satisfy myself that they had properly received all the messages sent to them by the Owners, their solicitors and myself.

9.   The following companies have been involved and have been the recipients of e-mails. The Charterers are incorporated in the Marshall Islands and have their registered office at the Trust Company of the Marshall Islands (TCMI). Their e-mail address is tcmi@ntamar.net. Mr E Bigler is an individual at this company and his direct e-mail address is ebigler503@comcast.net. Greystone Shipping is the shipbroker who negotiated this fixture. Their e-mail address is operations@greystoneshipping.co.uk. Greystone have confirmed passing on my e-mails to other companies and individuals involved with the Charterers, namely Diamant in Odessa who were the Charterers operating arm, but whose e-mail address has been disconnected according to Greystone and Goynas in Greece. The Greek lawyers acting for the Charterers are N Goyios – Nasssikas Law Offices in Piraeus with an e-mail address goynas@otenet.gr.

C:\Arbitrat\Despina\Draft Award.doc\27/03/09

<u>3</u>

10.    Although Greystone Shipping has advised me that all messages sent to them by me have been passed to N Goyios – Nasssikas Law Offices in Piraeus, I sent a copy of my final message dated 23rd March directly to them.

11.    In respect of the last e-mail I sent Greystone Shipping, they replied:
   *"Mr Edward Mocatta*
   *fm Greystone Shipping as brokers.*
   *–yours well rcvd [received] and passed on to e-mail address of Diamant Odessa*
   *(out of function/.seems to come up with delivery failure) and copy to Goynas*
   *Greece.*
   *Tks rgds"*

12.    This is not surprising since the Charterers have apparently filed for bankruptcy, liquidation and/or administration in Greece, which is being handled by N Goyios – Nasssikas Law Offices in Piraeus, to whom all messages have been passed.

13.    Having clearly established that all proper notices and advice of and relating to the Reference have been properly sent to parties now representing the Charterers, who have decided not to participate in any way, I will proceed to set out details of the Owners' claim.

14.    Pursuant to the Charterparty, Owners agreed to charter the vessel to the Charterers for one period of minimum 4 months to about 6 months maximum period not to exceed 5 December 2008. The Charterparty to which the Owners will refer and rely for its full terms and effect provided inter alia as follows:
   Clause 2
   "That, whilst on hire, the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port charges, all Pilotages, Agencies, boatage for Charterers' business, Commissions... and all other usual expenses except those before stated..."

   Clause 4
   "That the Charterers shall pay for the use and hire of the said Vessel at the rate of USD82,000 (Eighty Two Thousand Dollars) daily including over time payable every fifteen (15) days in advance in United States Currency and commencing on and from the day of her delivery, as aforesaid, and after the same rate for any part of a day; hire to continue until the hour of the day of her re-delivery in like good order and condition..."

   Additional Clause 49
   "Bunkers expected on delivery about 1,700 metric tons IFO and about 110 metric tons MDO. Bunkers on redelivery about same quantities as actually on delivery. Same prices at both ends...."

   Additional Clause 51
   "Charterers paying US$ 6,000 (Six Thousand Dollars) in lieu of hold cleaning before redelivery..."

   Additional Clause 67
   "All taxes and/or dues on the vessel and/or cargo and freight arising out of cargoes carried or ports visited under this Charter-Party shall be for Charterers' account."

15.    The last hire payment was due on Sunday 5th October 2008 to cover the period up to the estimated redelivery date. Despite Owners' repeated requests dated 2nd,3rd, 6th

4

and 7th October 2008 copies of which I have seen, Charterers failed to pay this last instalment and Owners claim US$1,076,117.77 in respect of unpaid gross hire.

16.    The Vessel was scheduled to redeliver after taking replenishment bunkers up to the proper redelivery quantities. Charterers redelivered the vessel with bunkers remaining on board at IFO 371.40 MT and MDO 42.50MT, substantially lower than the quantities on delivery IFO 1,790.696 MT and MDO 133.118 MT. I have seen documentation relating to this issue. B&L Transoil (Holdings) Ltd stemmed and delivered IFO 400.00MT and MDO 40.050 MT to the Vessel for Charterers' account at New Orleans on 16th September 2008, but Charterers failed to pay for these. Under protest and in order to avoid the vessel being arrested, Owners paid B&L Transoil the US$298,944.15 owed by Charterers, reserving the right to claim that sum from Charterers.

17.    Charterers failed to reimburse three payments of US Transportation Tax made by Owners, together totalling US$183,680.

18.    Wilhelmsen Ships Service gave agency services for Charterers' account at New Orleans and presented a disbursement account for Charterers' expenses. Charterers failed to pay the balance of that account. Under protest and in order to avoid the arrest of the Vessel, Owners paid Wilhelmsen the sum owed by Charterers of US$14,939.96, reserving the right to claim that sum from Charterers.

19.    Owners presented their final hire statement and notified the Charterers of the sums claimed on 13th October 2008. Charterers have failed to pay.

20.    The figures claimed are as follows:-
       Delivery at 27.05.08 at 1330 UTC   Redelivery at 11.10.08 at 1700 UTC

|  | US$ |
|---|---|
| Total hire 137D 3H 30M X $82,000 per day | 11,245,958. 33 |
| CVE | 9,143. 05 |
| BOD    IFO 1,790.696 mt x $675 | 1,208,719. 80 |
| MDO 133.118 mt x $1,250 | 166,397. 50 |
| Intermediate hold cleaning  2 x $5,000 | 10,000. 00 |
| ILOHC | 6,000. 00 |
| Invoice 30.06.08 – U.S. transportation tax | 50,840. 00 |
| Invoice 20.08.08 – U.S. transportation tax | 65,600. 00 |
| Invoice 13.10.08 – U.S. transportation tax | 67,240. 00 |
|  | US$12,829,898. 68 |
| Less Payments | 10,169,840. 23 |
| 5% commission | 562,297. 92 |
| BOR    IFO 371.40 mt x $675 | 250,695. 00 |
| MDO 42.50 mt x $1,250 | 53,125. 00 |
|  | (US$11,035,958. 15) |
| Balance due to Owners | 1,793,940.53 |
| Payment to Transoil by Owners | 298,944.15 |
| Payment to Wilhelmsen by Owners | 14,939. 96 |
| Total claimed | US$2,107,824.64 |

<u>5</u>

21. The total principal amount claimed by Owners amounts to US$2,107,824.64 with interest and costs.

22. Although the Charterers have not responded in any way I am obliged to look at each item in Owners claim to satisfy myself that it is justified and properly chargeable to Charterers.

23. <u>Gross hire US$11,245,958. 33</u>. The vessel was on charter between 27th May and 11th October 2008, a total of 137D 3H 30M which at a daily rate of hire of US$82,000 totals US$11,245,958. 33. Owners primary calculation of gross hire due is correct.

24. <u>CVE</u> Owners claim US$9,143.05 CVE (Communications Victualling and Entertainment). Lines 43 and 44 of the Charterparty provided "Cost of Communication, representation, victualling and entertainment for Charterers account to be lumpsum of US$2,000 per month or pro-rata. According to my calculation Charterers are obliged to pay US$258.06 for the 4 days in May, US$2,000 for each of the 4 months June-September and US$709.67 for 11 days in October, making a total of US$8,967.73. I presume Owners have used a slightly different method of calculating this sum, but the clause seems clear that it is US$2000 per month or pro-rata, and I prefer the above calculation.

25. <u>Bunkers.</u> By Additional Clause 49 Charterers were obliged pay for the bunkers on board on delivery and to redeliver with the same quantity namely about 1,700 metric tons IFO and about 110 metric tons MDO. As usual under a time Charterparty, on delivery Charterers were to pay and on redelivery Owners were to account for the bunkers remaining on board using the same price at both ends. I accept the amounts claimed by Owners for the bunkers on board on delivery and on redelivery. The quantities were then very much lower and Owners have explained that the Charterers had on 16th September stemmed 400mts IFO and 40.5mts MDO at New Orleans, which were delivered to the vessel but not paid for. Owners paid Transoil US$298,944.15 for these bunkers and seek recovery from Charterers.

26. It is at this point worth explaining the basis on which Owners paid for bunkers, freight taxes and Agency charges in New Orleans and claim repayment from Charterers. Under American law bunker suppliers, the taxation authorities and ship's agents have a maritime lien on any vessel to which they supply services or can charge freight tax and can exercise that lien by arresting the vessel to secure payment. This means that Owners are liable to pay these third party suppliers where Charterers default in doing so. Where by the wording of the Charterparty these items are payable by the Charterers, failure by them to do so allows the vessel to be arrested. To avoid the loss of time, additional expenses and legal fees that would be incurred, Owners, knowing that they were in any event liable to pay under US law, decided to pay these items and subsequently seek recovery from Charterers. I find that it was a reasonable and sensible step for Owners to take, and that Charterers are obliged to indemnify Owners for them.

27. Referring back specifically to the figures in the hire account relating to bunkers, I find that they are all reasonable. Owners are entitled also to recover US$298,944.15 they paid to B&L Transoil (Holdings) Ltd.

<u>6</u>

28. <u>Intermediate hold cleaning</u>. There appear to have been two intermediate hold cleanings, presumably in respect of the voyages from Houston to Aden and Yuzhny to New Orleans in respect of which US freight tax was payable. Clause 86 allows the Charterers to have the option to ask the ships' crew to perform intermediate hold cleaning on paying Owners US$5,000 each time. It seems to me that Owners are justified in seeking to recover this item.

29. <u>ILOHC</u> Clause 51 obliges Charterers to pay US$6,000 in lieu of hold cleaning before redelivery. The vessel was redelivered without being cleaned, so I regard Owners as justified in claiming this sum.

30. <u>US Transportation Taxes</u>. Clause 67, part of which is quoted above makes clear that Charterers have to pay any US freight or other taxes that become payable in respect of any voyage starting or terminating in US ports. Owners have provided supporting vouchers for US$65,600 payable on the voyage from Houston to Aden in June 2008, US$67,240 in respect of the voyage from Yuzhny to New Orleans in August 2008.

31. Owners are also claiming recovery of US$67,240 freight tax payable in October 2008 presumably on a final voyage from New Orleans to Lisbon where the vessel was redelivered. I have not been given any details of the various voyages performed by the vessel during this Time Charter and cannot therefore form a view as to whether or not freight tax was payable on 13th October 2008. It may well have been payable, but although Owners say an invoice for this was attached, I cannot trace this. Accordingly, I cannot accept that it has been paid, as with the other two item, and I cannot allow this item.

32. <u>5% Commission.</u> This has been correctly calculated on the gross freight and allowed as stated.

33. <u>Wilhemsen Ships Service Agency fees.</u> Owners have paid these fees notwithstanding that were payable by Charterers. As indicated above, where a charterer does not pay agency fees, the ships agent has a maritime lien against the vessel and can arrest her to enforce payment. It was, again as indicated above, a sensible precaution for Owners to pay these fees to avoid loss of time and additional expense. I shall allow this item, which has been properly vouched.

34. <u>Conclusion.</u> It follows that the Owners are entitled to recover the sums they have claimed, less a small adjustment in relation to CVE and the third payment of US freight tax which was un-vouched. This means the total claimed is to be reduced as follows:

| | |
|---|---|
| Amount claimed | US$2,107,824.64 |
| Less adjustment to CVE | 175.32 |
| Less third US freight tax | 67,240. 00 |
| Total amount recoverable | US$2,040,409.32 |

35. <u>Interest.</u> Owners are entitled to interest on this sum compounded at three monthly rests at a rate of 3.5% from 1st November 2008 to the date of payment.

36. <u>Costs.</u> Owners are entitled to recover both their costs incurred in this Reference, principally being the fees of their solicitors, and the Tribunal's fees.

C:\Arbitrat\Despina\Draft Award.doc\27/03/09

7

**NOW I,** the Undersigned Mr. Edward Mocatta, having taken upon myself the burden of this Arbitration and having carefully and conscientiously considered the submissions of the Owners, read and examined the documents and reached a decision **DO HEREBY MAKE, ISSUE AND PUBLISH** this my **FINAL AWARD:**

**I FIND AND HOLD** that the Owners' claim outlined above succeeds as to US$2,040,409.32.

**I AWARD AND ADJUDGE** that the Charterers shall forthwith pay to the Owners the sum of US$2,040,409.32 (Two million, Forty Thousand, Four Hundred and Nine United States Dollars 32 cents), together with interest compounded at three monthly breaks at the rate of 3.5% from 1st November 2008 until the date of payment.

**I FURTHER AWARD AND ADJUDGE** that the Charterers shall bear and pay their own and the Owners costs in the reference (the latter to be assessed if not agreed for which I reserve powers) and that the Charterers shall bear the costs of my Award which **I HEREBY TAX AND SETTLE** in the sum of £2,000-00 **PROVIDED ALWAYS THAT** if the Owners shall in the first instance have paid all or any part of my said costs they shall be entitled to prompt reimbursement together with interest calculated at the rate of 4 percent per annum, compounded with three monthly rests running from the date of payment until the date of reimbursement.

**GIVEN** under my hand in London this **27th** day of March 2009

..................................                                                                           ..................................
Mr Edward Mocatta                                                                                Witness